[867 NE2d 374, 835 NYS2d 523]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NICO LeGRAND, Appellant.

Argued February 14, 2007; decided March 27, 2007

## POINTS OF COUNSEL

*Center for Appellate Litigation,* New York City (*Jan Hoth* and *Robert S. Dean* of counsel), for appellant. I. The trial court erred in: (a) denying appellant's well-founded application to introduce expert identification testimony where the accuracy of identifications made seven years after the crime was the sole issue in the case; and (b) determining that, in any event, the evidence was inadmissible as it propounded theories that were not generally accepted by the scientific community. (*People v Drake,* 7 NY3d 28; *People v Young,* 7 NY3d 40; *People v Lee,* 96 NY2d 157; *People v Alvarez,* 198 AD2d 171; *Frye v United States,* 293 F 1013; *People v Wernick,* 89 NY2d 111; *People v Wesley,* 83 NY2d 417; *People v Taylor,* 75 NY2d 277; *Matter of Nicole V.,* 71 NY2d 112; *People v Keindl,* 68 NY2d 410.) II. Appellant's constitutional right to a speedy trial was violated where, without good cause, proceedings were not instituted against him until eight years after the crime and almost six years after he was identified as a suspect. (*People v Singer,* 44 NY2d 241; *People v Vernace,* 96 NY2d 886; *People v Lesiuk,* 81 NY2d 485; *People v Staley,* 41 NY2d 789; *United States v Marion,* 404 US 307; *Klopfer v North Carolina,* 386 US 213; *People v Taranovich,* 37 NY2d 442; *People v Watts,* 57 NY2d 299; *People v Johnson,* 38 NY2d 271; *People v Ranellucci,* 43 NY2d 943.)

*Robert M. Morgenthau, District Attorney,* New York City (*Meredith Boylan* and *Patrick J. Hynes* of counsel), for respondent. I. The delay in arresting defendant for second-degree murder did not violate his right to due process. (*United States v Lovasco,* 431 US 783; *United States v Marion,* 404 US 307; *People v Singer,* 44 NY2d 241; *People v Staley,* 41 NY2d 789; *People v Taranovich,* 37 NY2d 442; *People v Waldron,* 6 NY3d 463; *People v Vernace,* 96 NY2d 886; *People v Wing Keung Tsang,* 284 AD2d 218; *People v Rodriguez,* 281 AD2d 375, 96 NY2d 906; *People v*

*Suero,* 235 AD2d 357, 89 NY2d 1101.) II. The hearing court appropriately exercised its discretion in denying the admission of defendant's proposed expert testimony at trial. (*People v Lee,* 96 NY2d 157; *People v Smith,* 191 Misc 2d 765; *Frye v United States,* 293 F 1013; *People v Mooney,* 76 NY2d 827; *United States v Lumpkin,* 192 F3d 280; *United States v Rodriguez-Felix,* 450 F3d 1117; *People v Leone,* 25 NY2d 511; *People v Hughes,* 59 NY2d 523; *People v Schreiner,* 77 NY2d 733; *People v Wesley,* 83 NY2d 417.)

*David Loftis,* New York City, *Barry Scheck, Peter Neufeld* and *Ezekiel Edwards* for Innocence Project, Inc., amicus curiae. I. The trial court's determination to exclude expert testimony ignored the persistent problems of eyewitness identification that courts and scientists have undertaken and created a substantial risk of wrongfully convicting an innocent man. II. As suggestiveness exists within our judicial process, expert testimony is necessary to inform jurors of the causes of misidentification and its admission should not be hinged on a pretrial determination of the strength of the prosecution case. (*United States v Wade,* 388 US 218; *People v Adams,* 53 NY2d 241; *People v Riley,* 70 NY2d 523; *People v Brisco,* 99 NY2d 596, *habeas corpus granted sub nom. Brisco v Phillips,* 376 F Supp 2d 306; *People v Duuvon,* 77 NY2d 541; *People v Chipp,* 75 NY2d 327; *People v Hart,* 208 AD2d 861; *People v Lee,* 96 NY2d 157; *People v Riley,* 70 NY2d 523; *People v Prochilo,* 41 NY2d 759.)

*Steven Banks,* New York City, *Lorca Morello, Robert Garcia* and *Green & Willstatter,* White Plains, for Legal Aid Society and others, amici curiae. I. The testimony of a qualified expert on the factors affecting the reliability of eyewitness identification should be presumptively admissible when proffered by the accused at trial when identification is at issue. (*People v Taylor,* 75 NY2d 277; *People v Young,* 7 NY3d 40; *People v Lee,* 96 NY2d 157; *People v Smith,* 191 Misc 2d 765; *People v Carroll,* 95 NY2d 375; *People v Hudy,* 73 NY2d 40; *Rock v Arkansas,* 483 US 44; *Chapman v California,* 386 US 18; *Parker v Mobil Oil Corp.,* 7 NY3d 434; *People v Wesley,* 83 NY2d 417.) II. Appellant was deprived of a fair trial by the court's preclusion of expert eyewitness testimony. (*People v Goldstein,* 6 NY3d 119; *People v Wesley,* 83 NY2d 417; *People v Taylor,* 75 NY2d 277; *People v Jeter,* 80 NY2d 818; *People v Young,* 7 NY3d 40; *People v Drake,* 7 NY3d 28; *United States v Downing,* 753 F2d 1224.) III. The hearing court's decision is based on a fundamental misunderstanding of the scientific principles underlying eyewitness identification

research. (*People v Wesley*, 83 NY2d 417; *United States v Mathis*, 264 F3d 321.)

### OPINION OF THE COURT

JONES, J.

The main issue before us is whether the hearing court erred when it refused to admit expert testimony on the reliability of eyewitness identifications, which it concluded was based on novel scientific principles, theories or techniques that are not generally accepted by the relevant scientific community.

After a *Frye* hearing, Supreme Court found that the proposed testimony was relevant to the facts of the case, that defendant's witness was a qualified expert and that the proposed testimony was beyond the ken of the typical juror. However, the court denied defendant's motion to admit expert testimony, ruling that the proposed expert testimony was not generally accepted within the relevant scientific community. For the reasons that follow, we hold that where the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications if that testimony is (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror. Taking into account that trial courts generally have the power to limit the amount and scope of evidence presented, we nevertheless conclude that, in this case, the court erred when it precluded the testimony of defendant's eyewitness identification expert in its entirety.

### Facts and Procedural History

On the morning of June 15, 1991, livery cab driver Joaquin Liriano was stabbed to death on Morningside Drive in Manhattan. Liriano's assailant fled before the police arrived on the scene. Four people witnessed the attack, and within a few days collaborated on a composite sketch of the assailant. Two years later, defendant was identified as a possible suspect in the homicide when an officer who arrested him for an unrelated burglary concluded that he resembled the 1991 composite sketch. However, because the police were unable to find any of the witnesses to the stabbing, the homicide case stalled. The case

remained dormant until April 1998 when defendant was again arrested for burglary in the same precinct. Police again concluded that he resembled the composite sketch.

The authorities located the four witnesses who contributed to the composite sketch and one additional witness to the stabbing who was not identified until 1998. One of the witnesses identified defendant as the killer in a photo array and a lineup. Two of the remaining witnesses were shown the photo array, but neither made a positive identification. Specifically, one witness picked out defendant's photo as a "close, if not exact" match. A third witness described defendant's picture as "similar" to that of the assailant. The fourth and fifth witnesses also examined the photo array, but were unable to identify defendant. There was no forensic or other physical evidence connecting defendant to the stabbing.

Defendant was charged with second degree murder in April 1999. The People's case rested solely on identifications made nearly seven years after the crime. In April 2001, during defendant's first trial, three witnesses identified defendant as the perpetrator. However, two of the witnesses had seen defendant's photo array in the district attorney's office the night before they were to testify. Defendant's first trial ended in a mistrial (due to a hung jury) after three days of deliberation.

In June 2001, prior to his second trial, defendant, relying on this Court's decision in *People v Lee* (96 NY2d 157 [2001]), moved to introduce at trial the testimony of an expert in order to "educate the jurors as to the weaknesses and dangers inherent in eyewitness testimony and to present them with an appropriate perspective by which to judge such testimony." According to the supporting memorandum of law, the expert would testify as to research findings regarding several factors that may influence the perception and memory of a witness and affect the reliability of eyewitness identifications: in particular, the effect of "weapon focus," the lack of correlation between witness confidence and accuracy of identification, the effect of postevent information on accuracy and confidence malleability.[1] The expert would not, however, opine on the accuracy of any specific eyewitness identification. Moreover, defense counsel's affirmation stated that "[i]f any issues remain unresolved for the court as to the admissibility of such evidence, those issues could be resolved by conducting a Frye hearing prior to trial."

---

1. For common definitions of these factors, we refer the reader to *People v LeGrand* (196 Misc 2d 179, 180-181 [Sup Ct, NY County 2002]).

The prosecution opposed the motion on the ground that the theories that the defense wanted to introduce were "highly controversial." Further, the prosecutor argued that in *Lee*, this Court upheld the lower court's decision to preclude expert testimony addressing the same issues on which defendant's expert would testify here. The prosecutor also argued that cross-examination and/or jury instructions could counter a mistaken identification.

After conducting a *Frye* hearing, the court precluded the testimony on the ground that the expert's conclusions were not generally accepted in the relevant scientific community. At the second trial, the jury found defendant guilty of second degree murder. Defendant was sentenced to an indeterminate prison term of 25 years to life. The Appellate Division unanimously affirmed (28 AD3d 318 [2006]), and a Judge of this Court granted defendant leave to appeal (7 NY3d 758 [2006]). We now reverse and order a new trial.

## Discussion

Over the past few decades, criminal defendants have increasingly called on psychologists to offer expert opinion testimony regarding the objective and subjective factors that influence the reliability of eyewitness identifications. They argue that misidentifications may lead to false convictions and that in certain cases, experts may offer the jury much needed guidance regarding how to assess the reliability of an identification. Typically, such expert testimony is based on research findings from experiments that test how accurately experiment subjects (i.e., "witnesses") recall faces and other details under various conditions. According to one commentator, the overall research findings show that

> "witnesses often make mistakes, that they tend to make more mistakes in cross-racial identifications as well as when the events involve violence, that errors are easily introduced by misleading questions asked shortly after the witness has viewed the simulated happening, and that the professed confidence of the subjects in their identifications bears no consistent relation to the accuracy of these recognitions" (1 McCormick, Evidence § 206, at 880 [6th ed 2006]).

Although there may be risks associated with allowing an expert to apply research findings from experiments on the reliability of

eyewitness identifications to real-life identifications, these findings—produced through sound, generally accepted experimentation techniques and theories, published in scholarly journals and subjected to peer review—have over the years gained acceptance within the scientific community. On this point, then Judge Kaye previously stated that

"[t]o the extent that judicial acceptance is indicative of general scientific acceptance, the emerging trend today is to find expert psychological testimony on eyewitness identification sufficiently reliable to be admitted, and the vast majority of academic commentators have urged its acceptance . . . . [P]sychological research data is by now abundant, and the findings based upon it concerning cognitive factors that may affect identification are quite uniform and well documented" (*People v Mooney*, 76 NY2d 827, 829-830 [1990, Kaye, J., dissenting] [citations omitted]).

However, "in recognition that expert testimony of this nature may involve novel scientific theories and techniques, a trial court may need to determine whether the proffered expert testimony is generally accepted by the relevant scientific community" (*Lee*, 96 NY2d at 162, citing *People v Wesley*, 83 NY2d 417, 423-429 [1994]).

Eleven years after *Mooney*, we reexamined the admissibility of expert testimony on the issue of reliability of eyewitness identifications in *Lee*. In that case, defendant sought to introduce expert testimony on how factors such as the duration of an encounter, stress involved in the encounter and the passage of time between the crime and identification affect memory and eyewitness identification. The defendant also sought to have the expert explain the lack of correlation between a witness's confidence and the accuracy of the identification. The hearing court summarily rejected the eyewitness testimony as inadmissible. We held that in so rejecting the expert testimony, the court failed to exercise its discretion; "while such expert testimony is not inadmissible per se, the decision whether to admit it rests in the sound discretion of the trial court" (*Lee*, 96 NY2d at 160). A court's exercise of discretion depends largely on whether jurors, after the court considers their "day-to-day experience, their common observation and their knowledge," would benefit from the specialized knowledge of an expert wit-

ness (*see id.* at 162, quoting *People v Cronin*, 60 NY2d 430, 433 [1983]). The trial court should weigh defendant's request to admit expert testimony against factors "such as the centrality of the identification issue and the existence of corroborating evidence" (*id.* at 163). Under the particular facts and circumstances in *Lee*, we concluded that the trial court did not abuse its discretion in excluding the expert testimony.

In *People v Young* (7 NY3d 40 [2006]), this Court again examined the issue of the admissibility of expert testimony on the reliability of eyewitness identifications. Based upon the particular facts in that case, we found no abuse of discretion when the trial court excluded the testimony. In *Young*, defendant sought to introduce expert testimony

> "that people are generally more accurate in identifying people of their own race than of another race; that, where a crime is committed with a weapon, the victim's tendency to focus on the weapon may interfere with his or her observation of the criminal; that a stressful experience is more likely to be a memorable one up to a moderate level of stress, but that events generating higher levels of stress are remembered less well; and that there is only a very weak relationship between a witness's confidence in the accuracy of his or her recollection and its true accuracy—i.e., that people very confident in their recollections are often wrong" (*id.* at 43 [internal quotation marks omitted]).

In holding that the trial court did not abuse its discretion when it excluded the expert's testimony, we noted that the factors discussed by the expert were relevant to the victim's identification of defendant and that "if this case turned entirely on an uncorroborated eyewitness identification, it might well have been an abuse of discretion to deny the jury the benefit of [the expert's] opinions" (*id.* at 45).

Thus, it is clear that expert testimony regarding the factors that affect the accuracy of eyewitness identifications, in the appropriate case, may be admissible in the exercise of a court's discretion. Moreover, there are cases in which it would be an abuse of a court's discretion to exclude expert testimony on the reliability of eyewitness identifications.

We now conclude that this case falls in the latter category and that defendant's expert should have been allowed to testify. In reaching this conclusion, we first note that the hearing court

recognized the importance of the evidence to the defense and found that the proposed expert testimony was relevant to the issues and facts of this case. Further, we consider this case in light of *Lee*. It is clear that this case turned solely on the accuracy of the witnesses' identification; however, unlike *Lee* and *Young*, there was no corroborating evidence connecting defendant to the commission of the crime charged. Plainly, in light of these facts, the testimony of defendant's expert would have benefitted the jury in evaluating the accuracy of the eyewitness identifications.

In spite of the foregoing, the court excluded the testimony as not generally accepted in the scientific community under *Frye v United States* (293 F 1013 [DC Cir 1923]). In *Frye*, the court stated

> "[j]ust when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs" (*id.* at 1014).

Accordingly, "the *Frye* test asks 'whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally' " (*Parker v Mobil Oil Corp.*, 7 NY3d 434, 446 [2006], quoting *Wesley*, 83 NY2d at 422). Further, this test "emphasizes 'counting scientists' votes, rather than . . . verifying the soundness of a scientific conclusion' " (*id.* at 447, quoting *Wesley*, 83 NY2d at 439 [Kaye, Ch. J., concurring]). Once the general reliability concerns of *Frye* are satisfied, the court will consider whether there is a proper foundation "for the reception of the evidence at trial" (*id.*, quoting *Wesley*, 83 NY2d at 429). We conclude that it was not error for the court to conduct a *Frye* hearing, although we recognize that this Court and other New York courts have permitted and upheld a qualified expert's testimony regarding research findings on patterns of human behavior

without first requiring a *Frye* hearing.[2] Further, expert opinion testimony regarding the reliability of an eyewitness identification should be treated in the same manner as testimony offered by other experts. A court need not hold a *Frye* hearing where it can rely upon previous rulings in other court proceedings as an aid in determining the admissibility of the proffered testimony. "Once a scientific procedure has been proved reliable, a *Frye* inquiry need not be conducted each time such evidence is offered [and courts] may take judicial notice of reliability of the general procedure" (*Wesley*, 83 NY2d at 436 [Kaye, Ch. J., concurring]). Moreover, a number of New York courts have found that the *Frye* test has been met after considering whether factors that may affect eyewitness identifications should be admitted.[3]

Here, defendant's expert offered testimony at the *Frye* hearing that four factors which may influence the reliability of eyewitness identifications are generally accepted in the scientific community. In support of the expert's testimony, a survey demonstrating acceptance of these factors by an overwhelming majority of the experts in this particular field was introduced at the hearing. The methodology and results of this survey were criticized by the People's expert witness. We agree that the survey alone is not dispositive of the *Frye* issue; however, as to three of these factors—correlation between confidence and accuracy of identification, the effect of postevent information on accuracy of identification and confidence malleability—the defense expert's testimony contained sufficient evidence to confirm that the principles upon which the expert based his conclusions are generally accepted by social scientists and psychologists working in the field. Accordingly, defendant met his burden under *Frye*. As such, testimony as to these factors should not have been precluded at defendant's second trial. As to the fourth factor (the effect of weapon focus), we agree that there was insufficient evidence to confirm that the principles expounded by defendant's expert witness are generally accepted by the relevant scientific community. Thus, testimony as to this factor was properly excluded.

---

**2.** *See e.g., People v Brown*, 97 NY2d 500 (2002); *People v Taylor*, 75 NY2d 277 (1990); *Matter of Nicole V.*, 71 NY2d 112 (1987); *People v Keindl*, 68 NY2d 410 (1986); *Selkowitz v County of Nassau*, 45 NY2d 97 (1978); *People v Henson*, 33 NY2d 63 (1973); *People v Ciervo*, 123 AD2d 393 (2d Dept 1986); *People v Smith*, 191 Misc 2d 765 (Sup Ct, NY County 2002).

**3.** *See e.g., People v Drake*, 188 Misc 2d 210 (Sup Ct, NY County 2001); *People v Beckford*, 141 Misc 2d 71 (Sup Ct, Kings County 1988); *People v Lewis*, 137 Misc 2d 84, 86 (Monroe County Ct 1987); *People v Brooks*, 128 Misc 2d 608 (Westchester County Ct 1985).

Significantly, during the pretrial *Frye* hearing, the People proffered their own expert to challenge the defense expert's conclusions. In the scheme of things, it must be presumed that this witness would likewise have been available to testify before the jury. Further, it should be noted that although we hold that the expert testimony should have been admitted in this case, the court would still be obliged to exercise its discretion with regard to the relevance and scope of such expert testimony. Plainly, not all categories of such testimony are applicable or relevant in every case. In that event, admissibility would rest within the trial court's sound discretion.

Although the trend has been of late to more liberally admit such testimony—as recognized in *Lee* and *Young*—the admissibility of such evidence would also depend upon the existence of sufficient corroborating evidence to link defendant to the crime. In the event that sufficient corroborating evidence is found to exist, an exercise of discretion excluding eyewitness expert testimony would not be fatal to a jury verdict convicting defendant. Under the facts and circumstances of this case, the hearing court abused its discretion in failing to admit eyewitness expert testimony on the question of identification.

Defendant's remaining contention that his constitutional right to a speedy trial was violated lacks merit.

Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO, READ, SMITH and PIGOTT concur.

Order reversed, etc.