[867 NYS2d 1]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v QUENTIN ABNEY, Appellant.

First Department, October 14, 2008

## APPEARANCES OF COUNSEL

*Steven Banks, The Legal Aid Society,* New York City (*Richard Joselson* of counsel), and *Shearman & Sterling,* New York City (*Ashley W. Walker* of the District of Columbia bar, admitted pro hac vice, *Brian H. Polovoy, Karen S. Hart, Douglas R. Miller* of the District of Columbia bar, admitted pro hac vice, and *Chloe E. Neil* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney,* New York City (*Patrick J. Hynes* and *Mark Dwyer* of counsel), for respondent.

## OPINION OF THE COURT

FRIEDMAN, J.

Defendant was convicted of robbing a 13-year-old girl at knifepoint based on the victim's eyewitness testimony. Defendant argues that the conviction should be reversed, and the case remanded for a new trial, based on the trial court's refusal to permit the defense to present expert testimony on the reliability of eyewitness identifications. We disagree. Even if the proffered expert testimony was relevant to the reliability of the identification at issue, here there was evidence corroborating that identification. Thus, *People v LeGrand* (8 NY3d 449 [2007]), which requires the admission of expert testimony on the reliability of eyewitness identification under certain circumstances where "there is little or no corroborating evidence connecting the defendant to the crime" (*id.* at 452), does not mandate admission of the expert testimony in this case. For this reason, and because defendant's remaining arguments are also without merit, we affirm the judgment of conviction.

On June 2, 2005, at 3:20 P.M., as 13-year-old Farhana U. walked down the well-lit stairway into the subway station at Essex and Delancey Streets, she saw defendant coming up the stairs toward her. When he was about two feet away from her, and she could clearly see his face, he asked her for some change. Farhana, who at that point was not frightened and did not believe that defendant intended to harm her, told defendant that she had no change. Defendant at first continued walking

up the stairs, and Farhana took a couple of steps down. Then, defendant suddenly came around in front of her, held a knife close to her neck, and demanded a couple of times, in a harsh voice, that Farhana give him the necklace she was wearing, a gold chain with a heart-shaped locket. Farhana was frightened, and screamed "no" three or four times, but defendant ripped the chain from her neck and fled up the stairs. The robbery lasted a few seconds. Afterwards, Farhana went to the token booth clerk to report it.

Police Detective Samuel DeJesus interviewed Farhana in the presence of her brother. Farhana seemed frightened to DeJesus. She described the person who robbed her as a black male, over six feet tall, with pinkish lips, wearing a blue short-sleeved shirt and a blue bandanna. DeJesus, having worked on the investigation of a robbery committed in the same general area on May 28, recognized a possible connection, and prepared a photographic array that included defendant, who had been arrested for the May 28 robbery.[1] Within an hour of the June 2 robbery, Farhana picked defendant out of the photographic array.

Later that month, on June 22, defendant was located and arrested. Detective Ernest Dorvil phoned Farhana, told her that he had a suspect, and asked her to come to the station to view a lineup. Farhana, upon viewing the lineup, selected defendant as the man who robbed her.

At trial, shortly before jury selection, defendant moved to present expert testimony from Dr. Solomon M. Fulero regarding 15 psychological factors of memory and perception that may affect the accuracy of eyewitness identification. Defendant wanted to have Fulero testify about psychological studies showing that several factors present in this case typically affect the accuracy of an eyewitness identification. Supreme Court denied the motion as premature, but gave defendant leave to renew at the close of the People's direct case:

---

**1.** While we do not consider this matter in deciding the appeal, we note that the record reflects that defendant pleaded guilty to the May 28 robbery—which, like the June 2 robbery, involved the snatching of a chain from a female victim in a subway station—after the People moved to consolidate the indictments for the two crimes. At the trial for the June 2 robbery (after defendant's guilty plea to the May 28 robbery), the People made a *Molineux* motion to introduce evidence of the May 28 robbery for the purpose of showing a common pattern of criminal conduct. That motion was denied, to all appearances correctly. Still, we observe that the evidence of the May 28 robbery, had it been admissible, would have tended to corroborate defendant's guilt of the June 2 robbery by showing that the two crimes followed a common pattern.

"As a threshold matter, the defendant's papers fail to appropriately narrow the scope of the expert's proposed testimony. The defendant suggests that the expert will address three topics: event factors, investigation factors and witness confidence, as outlined on [p]ages 9 and 10 of the motion.

"But, those headings are really a full-fledged seminar on many of the studies and opinions in the field, any one of which could lead to hours of academic discussion and speculation, which would be inappropriate to present to a jury. . . .

"The defendant may be in a better position to narrow the scope of this application at the close of the People's direct case."

The court also pointed out that

"[u]nlike many lineup situations where photographic identification did not occur before a lineup . . . the victim must have realized here [that] the person whose photo she selected in the photo array would be in the lineup. In such a case, testimony [as to] how police investigation factors could influence a lineup is inappropriate."

Finally, the court stated that, upon request, it would charge the jury that the fact that a witness claims to be certain of her identification does not mean that the identification is accurate. Ultimately, such a charge was given.

On the People's direct case, Farhana testified to her recollection of the robbery and identified defendant as the perpetrator. After the People rested, defendant renewed his motion to admit expert testimony on eyewitness identification. Pointing to Farhana's testimony that she screamed during the robbery, Detective DeJesus' description of Farhana as frightened more than an hour after the robbery, and the inherent stressfulness of the event, defendant sought to introduce expert testimony that stress impairs the accuracy of an identification. Since Farhana testified that the incident took only a few seconds, defendant asserted that his expert should be allowed to testify that the less time an eyewitness has to observe an event the less accurately it will be remembered. Defendant also argued that the expert should be allowed to offer testimony to the effect that the violent circumstances of the robbery, including the use of a knife and the ripping of Farhana's chain, would adversely affect

her ability to remember the event, as would the fact that Farhana's attention would have been focused on the weapon rather than on the perpetrator's face. Defendant also intended to have the expert testify concerning the greater likelihood of an inaccurate identification in a cross-racial crime such as this one, which involved a victim of South Asian descent and an African-American perpetrator.

Defendant further argued that the identification was affected by certain investigation techniques that had been used in this case. Thus, defendant contended, the fact that Detective Dorvil told Farhana that the police had a suspect before she viewed the lineup may have impacted her identification. As to lineups in general, defendant wanted to elicit expert testimony on the subject of the relative reliability of sequential, simultaneous and double blind lineups. The deficiency in the lineup conducted here, defendant claimed, lay in the fact that Dorvil knew the suspect's identity as he supervised the lineup.

The court reaffirmed its earlier determination not to allow expert testimony, stating:

> "I, having had the benefit of the witness'[s] testimony, see nothing unique about this case that would present issues that are beyond the ken of the ordinary juror. All these issues were explored adequately on cross-examination and have been brought into question. They can be argued. There will be a charge."

On defendant's case, his counsel presented an alibi defense. It was defendant's position that he could not have robbed Farhana at 3:20 P.M. on June 2 at the Essex/Delancey subway station because he had picked up the daughter of his fiancée at 3:00 P.M. that day at a school located at 933 Herkimer Street in Brooklyn. To buttress this claim, defendant offered in evidence a sign-in/sign-out sheet purporting to document, by virtue of his signature thereon, that defendant had in fact made the pickup at the time he claimed. Defendant's fiancée, Mary Nimmons, testified that she obtained the sign-in/sign-out sheet from Carolyn Murphy, her daughter's assistant teacher.

An issue developed as to when Mary Nimmons picked up the sign-in/sign-out sheet. Although defendant was not arrested for the June 2 robbery of Farhana U. until June 22, Murphy testified that she was sure that defendant signed the sign-in/sign-out sheet on June 2 "[b]ecause the next day [June 3] Mary came to get this document." Since it is difficult to see any use

defendant could have anticipated for the sign-in/sign-out sheet other than as support for an alibi defense, and he was not arrested for the robbery of Farhana U. until June 22, Murphy's testimony was obviously devastating to his position that the wrong person had been charged with the June 2 robbery.

Similarly, when defense counsel asked Nimmons on direct examination about when she picked up the sign-in/sign-out sheet, she stated: "But, I didn't go there on June 2nd. It was probably about the next day." On cross-examination, she repeated that she went to pick up the sign-in/sign-out sheet on June 3, but, when asked why she did so, indicated that defendant called her after his arrest. Nevertheless, when cross-examined further, she reiterated the following:

"Q. And this incident occurred on June 2nd?

"A. Yes.

"Q. And you went to the school the following day?

"A. Yes."

The trial resulted in defendant's conviction. Defendant now appeals, arguing, among other things, that, under *People v LeGrand* (8 NY3d 449 [2007], *supra*), Supreme Court erred in excluding the expert testimony he proffered on the accuracy of eyewitness identifications. *LeGrand* held as follows:

> "[W]here the case turns on the accuracy of eyewitness identifications *and there is little or no corroborating evidence connecting the defendant to the crime*, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications if that testimony is (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror" (*id.* at 452 [emphasis added]).

The *LeGrand* Court noted that "not all categories of [eyewitness expert] testimony are applicable or relevant in every case" (*id.* at 459). Further, "[i]n the event that sufficient corroborating evidence is found to exist, an exercise of discretion excluding eyewitness expert testimony would not be fatal to a jury verdict convicting defendant" (*id.*).

As stated in *LeGrand*, a defendant seeking to admit expert testimony on eyewitness identifications must show that the

proffered expert evidence is "relevant to the witness's identification of defendant" (8 NY3d at 452). Here, to show the relevance of his expert's testimony to the reliability of the eyewitness identification in this case, defendant relied on the brevity and violence of the incident, the frightening and stressful character of the incident for the complainant, the different races of the victim and perpetrator, and the complainant's knowledge that the lineup included a suspect. While *LeGrand* establishes that, in an appropriate case, all of these factors may be proper subjects of expert testimony, it is far from clear that defendant established that this is such an appropriate case as to each factor he invoked.[2] After all, the complainant had an opportunity to see defendant, under well-lit conditions, before the encounter became stressful or violent. Further, if the complainant knew there was a suspect in the lineup, it was because she had previously made an identification from a photo array. In any event, even if it is assumed that defendant established the relevance of the proffered expert testimony relating to certain of the factors, we conclude that *LeGrand* does not require the admission of the expert testimony because the record includes "sufficient corroborating evidence" of defendant's guilt (*id.* at 459).[3]

Before turning to the evidence corroborating defendant's guilt, we observe that, of the several decisions over the past two decades in which the Court of Appeals has considered the admis-

---

**2.** To the extent the dissent suggests that the record establishes the relevance to this case of expert testimony on each factor defendant invoked, we disagree.

**3.** The dissent argues that reversal is required by the exclusion of expert testimony even on factors on which defendant made no proffer at the time he renewed his motion for leave to call the expert. Specifically, in arguing for reversal, the dissent makes reference to "the correlation between confidence and accuracy of identification, confidence malleability, and the effect of postevent information on accuracy of identification." The record reflects, however, that when defendant renewed his motion to present expert testimony, confidence malleability was not mentioned, and, as to postevent information, his counsel indicated that "there's no facts [*sic*] in this case, so it's not relevant." Those areas of inquiry were waived by defendant, to say nothing of the fact that defendant never addressed why the complainant would not have expected a suspect to be in a lineup conducted after she had made an identification from a photo array. Further, contrary to the dissent's implication, defense counsel was not entitled to renew defendant's motion to present expert testimony as to all factors simply by making a pro forma statement incorporating by reference the contents of the original motion. As the court instructed defense counsel, it was her burden to show the relevance of each factor as to which the expert would testify. Absent a particularized showing of the relevance of a given factor, defendant must be deemed to have abandoned the motion to present expert testimony as to that factor.

sibility of eyewitness expert testimony in criminal cases, *Le-Grand* is the only one in which it was determined that the exclusion of such evidence constituted an abuse of discretion. Further, the facts of *LeGrand* are far removed from the facts here, even when the lack of corroborating evidence in *LeGrand* is put aside. In *LeGrand*, after all, the defendant was convicted for a crime committed in 1991 after a retrial held 11 years later, in 2002 (the trial held the year before ended with a hung jury), and "[t]he People's case rested solely on identifications made nearly seven years after the crime" (8 NY3d at 453) . The circumstances that gave rise to special concern about the reliability of the eyewitness identifications in *LeGrand* were summarized in a later decision of this Court as follows:

> "[A] few days after a livery cab driver was stabbed to death [on June 15, 1991], four people who had witnessed the attack collaborated on a composite sketch of the assailant. Two years later, the defendant was identified as a possible suspect after a detective who arrested him for an unrelated burglary concluded that he resembled the 1991 composite sketch; however, because the police were unable to find any of the witnesses to the stabbing, the case remained dormant until 1998 when the defendant was again arrested for burglary in the same precinct and the police again concluded that he resembled the composite sketch. This time the police located the four original witnesses as well as an additional witness who was not identified until 1998. One of the witnesses identified the defendant as the killer in a photo array and a lineup. Two other witnesses were unable to make a positive identification from the photo array, but one of them picked out the defendant's photo as a 'close, if not exact' match (8 NY3d at 453). A third witness described the defendant's photo as 'similar' to the assailant and the two remaining witnesses were unable to identify the defendant from the photo array (*id.*)." (*People v Austin*, 46 AD3d 195, 200 [2007], *lv denied* 9 NY3d 1031 [2008].)

To complicate matters further, two of the three identification witnesses at the first *LeGrand* trial (which was held about 10 years after the crime) "had seen defendant's photo array in the district attorney's office the night before they were to testify" (8 NY3d at 453).

The facts of *LeGrand* make for a stark contrast with the facts bearing on the reliability of the eyewitness identification here. In this case, the complainant picked defendant's photograph out of a photo array only one hour after she was robbed on June 2. Defendant's image was included in the photo array because the police recognized that defendant, who had been arrested for a very similar robbery in the same area on May 28 (a crime to which he pleaded guilty), fit the complainant's description of the perpetrator of the June 2 robbery.[4] When defendant was located, a lineup was conducted on June 22, within three weeks of the robbery, and the complainant again identified defendant as the perpetrator. Defendant was represented at the lineup, about which his trial attorney stated, "When you look at the photo [of the lineup], you can see it looks like a very fair lineup." As to the circumstances of the crime itself, it is uncontroverted that it occurred in a very well-lit area and that, while the crime may have occurred within a few seconds, the complainant had two opportunities to see defendant at close range, first when he asked her for change and second when he returned brandishing a knife. Neither defendant nor the dissent points to any circumstance of the complainant's identification of defendant that casts doubt on its veracity.

The unusual fact pattern presented in *LeGrand* raises a genuine question as to whether that case's rule concerning admissibility of eyewitness expert testimony applies in cases, like this one, where the circumstances create much less doubt about the reliability of the identification testimony.[5] We need not answer this question today, however, because, as previously stated, the record of the instant appeal includes evidence providing significant corroboration of defendant's guilt. Thus, by the terms of the *LeGrand* rule itself, the exclusion of the proffered expert testimony was within Supreme Court's discretion.

---

4. We recognize, of course, that the initial identification of defendant from the photo array was not admissible (and was not, in fact, admitted) at trial, since the defense never opened the door to it. Presumably, however, the trial justice who excluded the expert evidence was aware of the photo identification, which had figured in a pretrial suppression motion decided by a different justice. As previously noted, evidence of the May 28 robbery was also properly excluded from the trial.

5. Notably, in *People v Austin* (*supra*), this Court affirmed a robbery conviction based solely on the victim's uncorroborated identification of the defendant, notwithstanding the exclusion of eyewitness expert testimony. In so doing, we contrasted the facts of *LeGrand* to the facts of the case at bar, as reflected in the above-quoted excerpt from *Austin* (46 AD3d at 200).

Simply put, the witnesses presented by defendant himself (Nimmons, the fiancée, and Murphy, the assistant teacher of Nimmons' daughter) had him seeking to document an alibi for the June 2 robbery (in the form of a school sign-in/sign-out sheet) on June 3, long before his arrest for that crime. Contrary to the dissent's assertion, this did not emerge for the first time during cross-examination. This evidence certainly supports the view that the complainant was not mistaken in her identification. In the face of such corroborative evidence, *LeGrand* does not require that the conviction be reversed because defendant was not allowed to present an expert witness on eyewitness identification.

Defendant, implicitly recognizing how damaging the testimony of Murphy and Nimmons is to his position, asserts that these witnesses were confused by poor acoustics in the courtroom. The record belies this explanation. Whatever defendant may say about the confusion of dates in Nimmons' testimony, Murphy's testimony was clear. Indeed, it is obvious that defendant immediately realized how much damage Murphy had done to his defense by referring to June 3, since his counsel promptly sought to get her to change her answer, an effort to which Supreme Court appropriately put a stop.

Defendant nonetheless asserts, and the dissent agrees, that the testimony of Murphy and Nimmons cannot be used as corroboration under *LeGrand* because it does not constitute physical or forensic evidence directly tying him to the crime. While it is true that *LeGrand* speaks of the absence of such evidence, nothing in *LeGrand* indicates that only such evidence qualifies as corroboration for purposes of deciding whether expert testimony on the reliability of eyewitness identification should be permitted. *LeGrand* states that where "there is little or no corroborating evidence connecting the defendant to the crime" (8 NY3d at 452), expert testimony on the reliability of eyewitness identifications should be admitted under appropriate circumstances. Contrary to the dissent's contention, *LeGrand* simply does not state that only forensic or physical evidence constitutes corroboration for these purposes.

Defendant deprecates the value of the testimony of Murphy and Nimmons on the ground that it is not direct evidence of criminality, but he does not dispute that the testimony in question may be considered as evidencing consciousness of guilt. While consciousness-of-guilt evidence is sometimes characterized as weak, it seems to us that, under the circumstances of

this case, and considering the purposes for which it is being considered, the evidence is of at least moderate value (*see People v Benzinger*, 36 NY2d 29, 33-34 [1974] ["false statements indicat(ing) a consciousness of guilt" had "a moderate degree of probative force" under the circumstances]).

We recognize that, based upon *LeGrand*, the trial court may very well have erred in refusing to permit the expert testimony when defendant renewed his application at the close of the People's case. Defendant, however, does not dispute that the People's case against him was legally sufficient, and, after the People rested, as defendant's case unfolded, it emerged that the eyewitness identification on which the prosecution was based found corroboration in the testimony of defendant's own witnesses, who described conduct by him that could logically be explained only by consciousness of guilt. In light of this corroboration (which, to reiterate, was unnecessary to entitle the People to take their case to the jury), it is apparent that any initial error in the exclusion of the expert testimony was ultimately revealed not to be error as the evidence unfolded at trial, or, considered otherwise, was harmless (*cf. People v Kello*, 96 NY2d 740, 744 [2001] [stating the harmlessness standard for errors in the admission of proscribed evidence]). *LeGrand* sets forth a rule of evidence and procedure and, given the undisputed legal sufficiency of the People's case, this Court may take account of the record as a whole in determining whether any error occurred.

With regard to the subject of defendant's alibi defense, and the dissent's observation that such defense was "by no means conclusively disproved," it seems to us that the dissent loses sight of the fact that there is no question that it always remained the People's burden to disprove the alibi, not conclusively, but beyond a reasonable doubt, to the jury's satisfaction. It also bears noting that the alibi defense further disintegrated in this case because it emerged (as more fully discussed below) that there were two versions of the very sign-in/sign-out sheet on which the alibi was based. While the dissent seems to believe that the redundancy of sign-in/sign-out sheets did not diminish the alibi defense, the jury was entitled to disagree. However, neither the People's burden to disprove the alibi defense, nor the self-destruction of that defense at trial, is truly pertinent to the question presented on this appeal, which is whether the eyewitness identification testimony was so lacking in corroboration as to render the exclusion of the expert

testimony reversible error.[6] Defendant was, of course, free to present evidence in support of an alibi defense, and to require the People to disprove that defense, but we know of no principle requiring us to shut our eyes to the fact that the alibi evidence he presented inadvertently corroborated the People's case, thereby curing (or rendering harmless) any possible error in the prior ruling excluding the expert evidence. In other words, having presented the evidence in question, defendant must accept not only its advantages, but also its disadvantages.[7]

Defendant also argues that his rights were violated when the court admitted into evidence as People's exhibit 6 (People's 6) a logbook of original school sign-in/sign-out sheets, which included a sheet for June 2, 2005 (the day of the robbery) that was different from the one defendant had previously introduced into evidence through Carolyn Murphy, the teaching assistant, in support of his alibi defense.[8] For the reasons discussed below, this argument is unavailing.

At the outset, no constitutional issue has been preserved for our review with regard to the admission of People's 6, as defendant did not raise any constitutional argument in that connection at trial (*see People v Kello*, 96 NY2d at 743-744). As an evi-

---

**6.** Contrary to the dissent's claim, we do not take the view that "the jury's rejection of the alibi drove the outcome of this trial"; rather, we recognize that the consciousness-of-guilt evidence that unexpectedly emerged from defendant's alibi defense corroborated the eyewitness identification evidence against him.

**7.** We disagree with the dissent's characterization of *People v Austin* (*supra*) as holding that "a court may not grant a motion to introduce expert testimony bearing upon the accuracy of an eyewitness identification on the basis of subsequently received evidence." In *Austin*, an unsuccessful pretrial motion to present expert testimony on this subject was not renewed by the defense at trial, even though the complainant's trial testimony arguably rendered the proffered expert testimony relevant. Since the trial testimony obviously was not before the court when it decided the pretrial motion, we recognized that such testimony did not retroactively turn the denial of the motion into reversible error (*see* 46 AD3d at 198). Nothing we said in *Austin* suggests that a defendant is precluded from renewing a previously denied motion for leave to present expert testimony on the reliability of eyewitness identification in light of subsequent trial testimony. To the contrary, we observed in *Austin*:

"Perhaps the better practice would have been to reserve decision or deny the motion with leave to renew during presentation of the People's case, at which time both the defense and the court would have been in a better position to consider the relevance of any expert testimony proffered on the effect of various factors on the reliability of eyewitness identification" (*id.*).

**8.** The June 2 sheet admitted as defendant's exhibit G reflects a pickup of the child of defendant's fiancée from the school at 3:00 P.M., while the June 2 sheet in People's 6 reflects such a pickup at 3:04 P.M.

dentiary matter, defendant's counsel stipulated on the record to the admission of People's 6, which, at the time of admission, the court described as "the logbook from March through June." Defendant argues that his counsel was unaware that the logbook included a sheet for June 2 because the prosecutor had earlier offered into evidence faxed copies of sheets from the logbook ending on June 1, the authenticity of which had been stipulated by defendant. However, at the time of the stipulation to the admission of People's 6, the court clearly indicated that People's 6 included documents "other" than those that had previously been faxed to the prosecutor, and, in particular, sheets "from March *through* June" (emphasis added), which should have alerted counsel to the possibility that a sheet for June 2 was included. Nonetheless, defense counsel never sought an opportunity to review People's 6 before it was admitted.

It should also be noted that the confusion over the school logbook was entirely the fault of the defense, which had not given the prosecutor the required pretrial notice that it would call a school employee (Carolyn Murphy) as an alibi witness to establish defendant's presence at the school at 3:00 P.M. on June 2. When the court nonetheless gave defendant leave to call Murphy, the People were forced to make a rushed, last-minute effort to obtain the logbook from the school, and the documents comprising People's 6 did not arrive at court until defense counsel was giving her summation. We further observe that the June 2 sheet in People's 6 also supports defendant's alibi. Contrary to defendant's contention, the court gave a sufficient clarifying instruction in response to the jury's note pointing out the presence of "two time in/time out sheets with the same date but different information."

The court properly denied defendant's motion to suppress the complainant's identification of him, as the lineup procedure did not involve any violation of defendant's rights. Defense counsel was present at the lineup and viewed it before the complainant did, but there was no requirement that defense counsel be given an opportunity to participate in setting up the identification procedure (*see People v Hawkins*, 55 NY2d 474, 485 [1982], *cert denied* 459 US 846 [1982] ["during a lineup counsel plays the relatively passive role of an observer"]). Defendant does not identify any unfairness in the lineup procedure that was used.

Finally, the court acted within its discretion in precluding the defense from calling two alibi witnesses of whom the People did not receive the requisite pretrial notice.

Accordingly, the judgment of the Supreme Court, New York County (William A. Wetzel, J.), rendered March 20, 2006, convicting defendant, after a jury trial, of robbery in the first degree, and sentencing him, as a persistent violent felony offender, to a term of 20 years to life, should be affirmed.

MOSKOWITZ, J. (dissenting). This appeal involves a core issue: whether the trial court abused its discretion by refusing to allow an expert to testify about factors that affect reliability of eyewitness identifications in light of the Court of Appeals' decision in *People v LeGrand* (8 NY3d 449 [2007]). The trial evidence shows that on June 2, 2005, at approximately 3:20 P.M., 13-year-old Farhana U. was accosted on a staircase at the Delancey Street subway station in lower Manhattan. A curved knife was held to her neck and, when she refused to surrender the necklace she wore, the necklace was ripped from her. While Farhana U. testified that at moments during the encounter she was able to view the perpetrator clearly, she also testified that the robbery lasted only seconds, that she was very scared and that she had never seen the perpetrator before.

Some three weeks subsequent to the robbery, after having selected defendant's picture in a photo array shown to her in the near aftermath of the crime and after a detective informed her that the police had a suspect, Farhana U. picked defendant out of a lineup.

In a detailed pretrial motion, that the People did not oppose, defendant sought permission to present expert testimony as to "psychological factors of memory and perception that may affect the accuracy of witness identifications." The court initially denied the motion, for the most part as premature, but also, in part, because the court found, without holding a *Frye* hearing, that certain proposed areas of expert testimony relied on theories not generally accepted as scientifically valid. The defense renewed the motion at the close of the People's case.[1] The People again offered no opposition. The court again denied the motion, this time solely upon the ground that the matters the expert's testimony proposed to cover were not beyond the ken of

---

**1.** The People's contention, adopted by the majority, that some of these factors were waived on the renewed motion, does not reflect a fair construction of the record. It would appear that defense counsel was merely describing the court's prior ruling on the initial motion, not conceding that any of the proffered testimony was irrelevant. We note that counsel, on renewal, specifically excepted to the court's rejection of the proffered testimony bearing upon witness confidence and excepted "as well . . . to the other areas that the Court would find inadmissible."

ordinary jurors. The jury convicted defendant of the charged robbery. Defendant now urges that the exclusion of testimony from his expert, bearing upon the accuracy of Ms. U.'s identification of him, constituted error and deprived him of a fair trial.

In *People v LeGrand* (8 NY3d 449 [2007]), which the Court of Appeals decided subsequent to the trial of this matter but is nonetheless applicable in determining this appeal (*see People v Vasquez*, 88 NY2d 561, 573 [1996]; *and see e.g. People v Gonzalez*, 47 AD3d 831 [2008], *lv denied* 10 NY3d 863 [2008]), the Court held that

> "where the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications if that testimony is: (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror" (*LeGrand* at 452).

There is no dispute that this case "turns on the accuracy of [an] eyewitness identification[ ]," and that at the time the trial court ruled upon defendant's motion there was not a scintilla of "corroborating evidence connecting the defendant to the crime." Indeed, there was at that juncture not even the prospect of that evidence. Plainly, then, the denial of the motion constituted an abuse of discretion, unless the proffered evidence failed to meet *LeGrand*'s four enumerated conditions. No issue is raised as to whether the proffer satisfied conditions one and three. Nor does it seem debatable that the proffer satisfied, at least in part, conditions two and four. *LeGrand* expressly found several of the proposed subjects of defendant's expert's testimony to have general acceptance in the scientific community (8 NY3d at 458): namely the correlation between confidence and accuracy of identification, confidence malleability, and the effect of postevent information on accuracy of identification. To the extent the others are not already recognized as proper subjects for expert explication, given the detailed nature of defendant's proffer and the obvious relevance of the proposed testimony to the reliability of the incriminating identification, the court should not have summarily rejected them without a *Frye* hearing.

The court's summary conclusion that the proposed testimony of defendant's expert would not shed light upon areas already within an average juror's experience was plainly incorrect. "[I]t cannot be said that psychological studies regarding the accuracy of an identification are within the ken of the typical juror" (*People v Lee*, 96 NY2d 157, 162 [2001]). Nor do the results of these studies correspond with our expectations from ordinary experience. To the contrary, these studies have yielded findings at once highly counterintuitive and highly relevant to the assessment of the accuracy of eyewitness identification testimony, among them, for example, one that would have been particularly pertinent in this case, i.e., that there is an inverse relation between high levels of stress and the reliability of the stressed individual's identification (*see People v Young*, 7 NY3d 40, 43 [2006]). Such counterintuitive information, accessible through scientific inquiry rather than common experience, affords jurors "more perspective than they get from their day-to-day experience" (*id.* at 45 [internal quotation marks omitted]) and cannot be adduced through cross-examination of an identifying witness or effectively imparted by means of a standard jury charge (*see People v Mooney*, 76 NY2d 827, 831 [1990, Kaye, J., dissenting]).

It is true that the facts in *LeGrand* were extreme, and that the circumstances at bar are less extreme. However, it is also true that no reasonable reading of *LeGrand* could engender the highly artificial notion that the Court intended to tether the application of its holding to the particular circumstances of that case. Rather, *LeGrand* recognizes that there is now persuasive scientific evidence that, under certain circumstances, eyewitness identification testimony, even while apparently convincing and certain, is fraught with error (*see LeGrand*, 8 NY3d at 454-455). We should not limit *LeGrand*, then, to its facts, and thus effectively consign it to jurisprudential oblivion. Instead, we should apply *LeGrand* in accordance with its broadly articulated holding and remedial purpose, that is, to enhance the quality of the deliberative process as well as the reliability of its outcome where a prosecution depends entirely on substantially uncorroborated eyewitness testimony and the introduction of expert testimony is otherwise warranted. Obviously, this does not mean that in every case turning on eyewitness identification testimony, a court must admit expert testimony bearing on the reliability of the identification (*People v Mooney*, 76 NY2d at 833). It is a relatively infrequent case in which there is no other evidence of a defendant's connection to the charged crime, and the particu-

lar circumstances of a case will often render expertise about the accuracy of an identification of little or no utility. This, however, is not such a case. It is not, for example, a case in which the identifying witness previously knew the perpetrator, or in which the opportunity to observe was ample, or in which extreme stress or cross-racial factors could have played no role affecting the reliability of the identification, or in which the witness was not distracted from her observation of the perpetrator by the near and undoubtedly terrifying presence of a threatening weapon, or in which there was no question as to whether police conduct and procedures affected the witness's post-incident identification. This is not *LeGrand*, but it is an eyewitness case, indeed a single eyewitness case, in which issues bearing upon the reliability of the inculpatory identification were clearly raised and in which the jury could have benefitted from the analytic perspective that defendant, in his proffer, sought to provide through his expert. It is a case in which the limitation upon a trial court's discretion enunciated in *LeGrand* is clearly applicable and in which the trial court exceeded that limitation in the exercise of its discretion (*see e.g. People v Gonzalez*, 47 AD3d 831, 833 [2008]).

The majority's contention that the court properly rejected defendant's proffer under *LeGrand* because there was corroborative evidence is simply incorrect. As noted, at the time of the trial court's denial of defendant's motion, there was absolutely no corroborative evidence before the court. The court denied defendant's motion at the close of the People's direct case. The purportedly corroborative evidence, upon which the People and the majority now rely, did not surface until well into defendant's case, emerging as it did altogether unexpectedly during the cross-examination of two of defendant's witnesses he called as part of an alibi defense. We have, of course, held that a court may not grant a motion to introduce expert testimony bearing upon the accuracy of an eyewitness identification on the basis of subsequently received evidence (*see People v Austin*, 46 AD3d 195, 198 [2007], *lv denied* 9 NY3d 1031 [2008]),[2] and it would be no less offensive to fairness, orderly procedure and, indeed, logic, retrospectively to permit the denial of such a motion upon

---

**2.** To the extent the majority itself relies on *People v Austin* (46 AD3d 195 [2007]), it is misplaced as in that case the defendant failed to establish the relevance of the proffered expert testimony to the particular facts of that case. Here, the People did not contest defendant's motions and even on appeal do not contest the relevancy of the initial topics defendant proposed.

an evidentiary predicate not before the court at the time of the motion's disposition. Moreover, because the People did not raise, much less argue, the factual issue of whether there was sufficient corroboration of defendant's connection to the charged offense to warrant the motion's denial, this Court may not review it. Therefore, corroboration may not now be urged, much less adopted, as an alternative theory in support of an affirmance (*see* CPL 470.15 [1]; *People v Romero*, 91 NY2d 750, 753-754 [1998]). Even with this "post hoc" evidence, other than the victim's testimony, the jury had no physical or forensic evidence connecting defendant to the crime.

The majority stresses evidence that in no way actually connects defendant to the charged crime, but is at best some evidence of consciousness of guilt. It fails to realize that the course of this trial could well have been different had the court not excluded the proffered expert testimony. Defendant's conviction was not, and could not have been, premised upon whether the prosecution disproved his alibi; rather it was necessarily premised upon whether the complainant correctly identified him. Ultimately, it was the jury's decision to credit the complainant's identification, not the rejection of defendant's alibi, that dictated the trial's outcome. Had the court permitted defendant to challenge the reliability of the identification by means of the proffered expert testimony, it is entirely possible that the jury would not have believed the accuracy of the inculpatory identification, and it is also entirely possible that the jury would, in that event, have credited defendant's alibi (although it would not have had to do so to reach a verdict of acquittal).

While it is true that there was some evidence that defendant sought to establish an alibi prior to his arrest, the timing of defendant's request for the sign-out sheet indicating that he had been at Herkimer Street in Brooklyn some 20 minutes prior to the charged crime at Delancey Street in lower Manhattan[3] was by no means definitively established. Ms. Nimmons clarified that defendant did not request her to retrieve the sign-out sheet until after his arrest, and although Ms. Murphy did testify that Ms. Nimmons requested a copy of the sign-out sheet the day after the robbery, it is noteworthy that Ms. Murphy, upon whose testimony the majority places such reliance, also specifi-

---

**3.** It is not disputed that if, in fact, defendant was at the Herkimer Street location 20 minutes before the crime, he could not also have arrived at the Delancey Street station in time to commit the crime.

cally testified that, some 20 minutes before the robbery, she saw defendant come into the classroom at the Herkimer Street day-care center where she worked and that she saw him, at that same time, sign the sign-out sheet.[4] Also noteworthy is the confirmation of defendant's presence at the day-care center at or near 3:00 P.M. on the day of the robbery by both the copy of the sign-out sheet Ms. Murphy gave to Ms. Nimmons and by the sign-out sheet for the same day the People retrieved directly from the day-care center during the final stages of the trial. The point of all this is that defendant's alibi was by no means conclusively disproved and that it is altogether possible that the jury would have given it credit if the jury had some additional framework to question the reliability of the complainant's identification.

The majority's conclusion that the jury's rejection of the alibi drove the outcome of this trial, even had the court accepted defendant's expert proffer, is thus speculative on two counts: first for its supposition that the jury would, in that alternative scenario, have rejected the alibi and second for its additional supposition that the alibi defense and the evidence related to it, both for and against, would, in that scenario ultimately have played any role at all in the jury's determination. As noted, the jury could have acquitted the defendant solely upon the determination that the complainant's identification was insufficiently reliable. On this record it cannot be said that it would not have done so.

SAXE and CATTERSON, JJ., concur with FRIEDMAN, J.; LIPPMAN, P.J., and MOSKOWITZ, J., dissent in a separate opinion by MOSKOWITZ, J.

Judgment, Supreme Court, New York County, rendered March 20, 2006, affirmed.

---

4. The court inquired of Ms. Murphy: "Do you specifically remember him [defendant] signing it [the sign-out sheet] on June the 2nd?," to which the witness replied, "Yes." To the prosecutor's immediately following inquiry as to how Ms. Murphy remembered, the witness responded, "Because I saw him come into the classroom and sign it."