RAUL SALAZAR, Appellant, v NOVALEX CONTRACTING CORP. et al., Respondents. (And a Third-Party Action.) [897 NYS2d 423]—

Order, Supreme Court, Bronx County (Mary Ann Brigantti-Hughes, J.), entered on or about December 19, 2007, which, to the extent appealed from as limited by the briefs, granted the motion of defendants Novalex Contracting Corp., 96 Rockaway, LLC, and T-Construction Co., Inc. for summary judgment dismissing plaintiff's Labor Law § 240 (1) and § 241 (6) claims, reversed, on the law, without costs, the motion denied, and the claims reinstated.

Plaintiff was injured while he was spreading freshly poured concrete in the basement of a building that was being renovated. He fell into an open trench while walking backwards and using a tool to smooth out the concrete. Although his torso remained

at floor level, his entire right leg went into the trench. According to plaintiff, the room in which the accident occurred contained several trenches. He testified that the trench he fell into was approximately four feet deep, two feet wide and between 10 and 15 feet long. A representative of defendant Novalex Contracting Corp., the general contractor, stated that there was only one continuous trench, which branched off in several directions. That witness testified that the depth of the trench varied from one foot to three feet and that it was two feet wide. He stated that the trench had been dug so that another contractor could lay underground piping for the building's sanitary system.

Part of plaintiff's task was to spread concrete that was to be poured into and over the trenches. However, he testified that when the accident occurred, he was spreading concrete on the floor and was not attempting to spread concrete in or into any trench. Indeed, he did not know that a trench was behind him when he fell.

Defendant T-Construction Co., Inc., plaintiff's employer,* moved for summary judgment dismissing the complaint as against it. As is pertinent to this appeal, it argued that the evidence established that it did not violate Labor Law § 240 (1) and § 241 (6). With regard to section 240 (1), the employer maintained that the trench into which plaintiff fell was not an elevation-related hazard and that it was just one of the usual and ordinary dangers associated with a construction site. With regard to section 241 (6), the employer asserted that none of the predicate Industrial Code provisions cited by plaintiff, including 12 NYCRR 23-1.7 (b) (1), governing "hazardous openings," applied to the facts of this case.

The owner, 96 Rockaway, LLC, and general contractor cross-moved for summary judgment. Both expressly adopted the employer's arguments regarding Labor Law § 240 (1) and § 241 (6).

The motion court found that section 240 (1) did not apply because the "accident did not result from a fall from a significant height or gravity related risk that could have been prevented with the use of one of [the] protective devices enumerated in the statute." The court further found that Industrial Code (12 NYCRR) § 23-1.7 (b), upon which the section 241 (6) claim was predicated, did not apply because plaintiff "did not fall through an opening to a level below."

---

* It is unclear from the record why the exclusivity rule of Workers' Compensation Law § 10 did not act to bar plaintiff's claims against his employer.

*Carpio v Tishman Constr. Corp. of N.Y.* (240 AD2d 234 [1997]) involved facts similar to those of this case. There, the plaintiff was extending a paint roller that he was going to use to paint a ceiling. As he was looking up at the ceiling, his leg fell three feet down a 10-to-14-inch-wide shaft in the surface of the floor. This Court awarded him summary judgment on his Labor Law § 240 (1) claim. Relying in part on "common sense," we observed that the risk of injury to the plaintiff was "gravity-related" because it was created by "the 'difference between the elevation level of the required work' . . . and 'a lower level' " (240 AD2d at 235, quoting *Rocovich v Consolidated Edison Co.*, 78 NY2d 509, 514 [1991]).

Here, the basement floor on which plaintiff was walking immediately before his accident was equivalent to the floor on which the plaintiff in *Carpio* was standing before he fell. The bottom of the trench into which plaintiff fell is no different from the bottom of the shaft in *Carpio*. Because the risk in this case was elevation-related, as in *Carpio*, Labor Law § 240 applies, and it was error for the motion court to dismiss plaintiff's claim under that section.

The holdings in *Rocovich v Consolidated Edison Co.* (78 NY2d 509 [1991], *supra*) and *Toefer v Long Is. R.R.* (4 NY3d 399 [2005]) do not alter this conclusion. In *Rocovich*, the Court of Appeals found that there was no liability under Labor Law § 240 because it was "difficult to imagine how plaintiff's proximity to" a 12-inch deep, 18-to-36-inch-wide trough carrying a stream of hot oil "could have entailed an elevation-related risk" (78 NY2d at 514-515). Here, plaintiff's task required him to traverse a floor that contained an opening of significantly greater width and depth than that encountered in *Rocovich*. Indeed, in contrast to *Rocovich*, the bottom of the trench in this case represented a separate *level*, which, relative to the floor itself, surely constituted a gravity-related hazard covered by section 240, even by the standard articulated by the Court of Appeals in *Rocovich* (*id.*).

In *Toefer*, the Court of Appeals held that section 240 did not apply to a worker's fall from the inherently stable surface of a flatbed truck (4 NY3d at 408-409). *Toefer* has no bearing on this case, because there the surfaces on which the plaintiffs were working were inherently safe and a reasonable owner or contractor would not foresee that a person would fall from them. Here, it was eminently foreseeable that a worker would fall into a portion of the trench while spreading concrete on the floor.

The dissent asserts that this case is analogous to other cases in which this Court found that Labor Law § 240 (1) did not ap-

ply. However, those cases are inapposite. In both *Romeo v Property Owner (USA) LLC* (61 AD3d 491 [2009]) and *Geonie v OD & P NY Ltd.* (50 AD3d 444 [2008]), the worker stepped into an opening in a raised "computer floor" that was created when one of the floor tiles was removed. In *Romeo* the opening was a mere two feet by two feet and 18 inches deep. It can be presumed that the dimensions of the opening in *Geonie*, although not disclosed in the decision, were similar.

In each of these cases the dimensions of the opening in the floor were not sufficiently significant that the worker could be said to have been working at an elevation. In contrast, the trench that plaintiff fell into here was, according to plaintiff, four feet deep and 15 feet long. Further, plaintiff's work area, which was approximately 25 feet by 20 feet, did not contain a single hole of small dimensions. Rather, it contained several long, uncovered trenches (or, according to the general contractor, one large, continuous trench that extended in various directions). Nearly everywhere plaintiff could have turned, a falling hazard presented itself. Under those circumstances, plaintiff's workplace was certainly elevated for purposes of Labor Law § 240.

In reaching this conclusion, we have considered the other cases from this Department cited by the dissent. However, after careful examination, we have determined that they are distinguishable on their facts. We fail to see how this constitutes a rejection of stare decisis, which we agree with our dissenting colleague is a "principled concept."

Recognizing that its position is inconsistent with settled law of this Department, the dissent argues that the various cases it cites from other Departments should be followed and that we should overrule *Carpio*. However, the holdings in those cases do not compel any change in the law of this Department, because they are not consistent with the Court of Appeals cases on which they purport to rely. As discussed, neither *Rocovich* nor *Toefer* holds that the type of hazard encountered by plaintiff here is not covered by Labor Law § 240 (1). *Bond v York Hunter Constr.* (95 NY2d 883 [2000]) and *Dilluvio v City of New York* (95 NY2d 928 [2000]) involved falls from a construction vehicle and a pickup truck, respectively, not from the floor on which a worker was situated into a trench or hole in that very floor. *Broggy v Rockefeller Group, Inc.* (8 NY3d 675 [2007]) found that there was no section 240 (1) violation because the plaintiff could not establish that the desk that created the elevation was necessary for the performance of the task at hand. In this case, plaintiff could not have avoided being at a higher elevation in relation to the bottom of the trench when the accident occurred.

Absent any Court of Appeals precedent to the contrary, *Carpio* remains the law of this Department. Indeed, as this Court recognized in *Carpio*, the Labor Law "is to be construed as liberally as may be for the accomplishment of the purpose for which it was thus framed" (240 AD2d at 235, quoting *Koenig v Patrick Constr. Corp.*, 298 NY 313, 319 [1948]). Thus, we are constrained to afford protection thereunder wherever that is consistent with Court of Appeals authority, and not to limit the statute's scope as the dissent urges.

Although defendants themselves do not make the argument, the dissent argues for them that there was no Labor Law § 240 (1) violation because "the record plainly establishes that filling the trench with concrete was an integral part of the work being performed at the time of the accident." However, the record does not contain any such facts and does not support the dissent's supposition that it was necessary to have the trenches open at the time plaintiff fell inside one. Moreover, the dissent ignores the rule articulated by the Court of Appeals that "where an owner or contractor fails to provide any safety devices, liability is mandated by the statute without regard to external considerations such as rules and regulations, contracts or custom and usage" (*Zimmer v Chemung County Performing Arts*, 65 NY2d 513, 523 [1985]). This Court recently cited *Zimmer* as authority for rejecting certain defendants' argument that "to provide an appropriate safety device was . . . impracticable under the circumstances" (*Pichardo v Urban Renaissance Collaboration Ltd. Partnership*, 51 AD3d 472, 473 [2008]).

The motion court also erred in dismissing plaintiff's Labor Law § 241 (6) claim. In support of this claim, plaintiff relied on 12 NYCRR 23-1.7 (b) (1) (i), which provides: "Every hazardous opening into which a person may step or fall shall be guarded by a substantial cover fastened in place or by a safety railing constructed and installed in compliance with this Part (rule)." This Court has defined the term "hazardous opening" as an opening "large enough for a person to fit" into (*Messina v City of New York*, 300 AD2d 121, 123 [2002]). Contrary to the motion court's statement, there is no requirement that a plaintiff relying on this rule fall to a floor below. Here, the two-foot wide, three-to-four-foot-deep trench into which plaintiff's entire right leg entered was clearly covered by the rule. The cases cited by defendants in support of their argument that the opening was not large enough to merit the protection of the rule are inapposite. In *Messina*, the plaintiff's section 241 (6) claim was dismissed because the drainpipe hole in question was only ap-

proximately 12 inches in diameter and 7 to 10 inches deep. Similarly, in *Piccuillo v Bank of N.Y. Co.* (277 AD2d 93, 94 [2000]), the plaintiff stepped into a "hand-hole" that was only approximately 12 inches wide and 8 inches deep.

The dissent argues that the rule does not apply because plaintiff did not fall into an opening at least 15 feet deep. This argument relies on 12 NYCRR 23-1.7 (b) (1) (iii) (a), which requires planking to be placed at least 15 feet beneath a "hazardous opening," where workers "are required to work close to the edge of such an opening." However, this subdivision only applies where the opening must remain open for work to progress. As discussed below, defendants did not establish that this was the case here. Indeed, the dissent mischaracterizes the record when it states that "plaintiff was injured while engaged in filling the trench, a task that could not be performed while the trench was covered." According to plaintiff's testimony, he was not filling the trench when he fell; he was spreading concrete and did not even know that the trench was immediately behind him. Moreover, the dissent reads subdivision (b) (1) (iii) so expansively that its construction negates the balance of the rule, which requires a "substantial *cover*" for hazardous openings (12 NYCRR 23-1.7 [b] [1] [i] [emphasis added]). It must be noted here that the dissent is overreaching since not even defendants rely on subdivision (b) (1) (iii) in arguing that the rule does not apply to the trench into which plaintiff fell.

Plaintiff's employer suggests that, even if the size of the hole required that the hole be protected, the rule would not apply because "where a cover or railing would completely frustrate the purpose for which the opening is made, the opening may not be deemed hazardous." Similarly, defendant general contractor asserts that the rule is inapplicable because "[t]he use of a cover, railing or some other device to barricade the trench would have prevented the plaintiff and his coworkers from performing the task they were retained to perform." These assertions are not sufficiently supported by the record that we can conclude, as a matter of law, that defendants could not have complied with the rule. Plaintiff's uncontradicted deposition testimony establishes only that he was spreading concrete on the floor of the basement when he fell and that he had no immediate intention of directing concrete into the trench into which he walked backwards.

There is nothing in the record to indicate that the work could only have been performed in such a manner as to permit no choice but to have the trench open at the time plaintiff fell inside it. Indeed, plaintiff testified that the concrete was being

poured from wheelbarrows that were repeatedly filled from a source outside the building. In other words, the concrete was not simply being poured onto the basement floor in one continuous flow. This suggests that the trench could have been covered, and remained covered, until it was time for a wheelbarrow of concrete to arrive to pour concrete directly into it. Even had defendants sequenced the work in such a manner, the workers, as the dissent puts it, "still would have been required, at the end of the process, to stand next to an uncovered trench being filled with cement." However, defendants would have significantly reduced, if not eliminated, the hazard that someone such as plaintiff would inadvertently stumble into an open trench. In determining whether an owner or contractor complied with the Labor Law, the analysis should consider not only how the work was done but also whether it could reasonably have been done in a different way that would have better ensured the safety of the workers.

In any event, plaintiff was not required to present evidence that a different method from the one that was utilized would have been feasible. On this motion for summary judgment, it was defendants' burden to establish that they could not have complied with the Labor Law and the applicable Industrial Code provisions because of the conditions existing in the basement where plaintiff was injured. Defendants failed to meet that burden. Accordingly, defendants' motion for summary judgment should have been denied. Concur—Mazzarelli, J.P., Moskowitz and Acosta, JJ.

Friedman, J., dissents in a memorandum as follows: The primary issue presented by this appeal is whether a claim under Labor Law § 240 (1) potentially arose when a worker engaged in cementing a basement floor injured himself by accidentally stepping into a three-to-four-foot-deep trench in the floor. The trench could not be covered during the work for the simple reason that it was the workers' job to fill it. Further, neither plaintiff nor the majority suggests that the "routine workplace risk[ ]" (*Runner v New York Stock Exch., Inc.*, 13 NY3d 599, 603 [2009]) posed by the trench could have been addressed by any safety device within the contemplation of the statute, which refers to scaffolding, hoists, stays, ladders and other devices intended to provide protection from substantial elevation-related risks.

In the recent past, two of the three justices constituting the majority of this panel have held, in accordance with Court of Appeals precedent, that section 240 (1) does not apply where the situation did not call for the use of a device within the ambit

of the statute. Nevertheless, and without offering a sound explanation of why that principle does not apply here, the majority determines to reinstate plaintiff's claim under section 240 (1). This kind of decision-making seems inconsistent with a principled concept of stare decisis. I therefore respectfully dissent.

On May 1, 2004, plaintiff and his father, as employees of defendant and third-party defendant T-Construction Co., Inc., were working on a renovation project at 96 Rockaway Avenue in Brooklyn. T-Construction was the concrete subcontractor on the job, and plaintiff and his father were assigned to lay down a concrete floor in a basement. The concrete was poured from a truck into wheelbarrows in the basement by way of a chute through a window, and then dumped on the unfinished floor. Plaintiff used a rake-like device to spread, or "pull," the concrete over the floor, while his father leveled it with a trowel.

Within the floor were open trenches containing plumbing pipes. In the course of laying down the concrete floor, the trenches were to be filled with concrete so that there would be one continuous floor surface. In that regard, plaintiff testified as follows:

"Q. Were you directed to do anything with respect to the holes [i.e., trenches] at 96 Rockaway Avenue[,] were you instructed to cover them, fill them, or something else?

"A. Yes, we had to fill them up.

"Q. What were you going to fill up the holes with?

"A. Concrete. . . .

"Q. How did you learn that you had to fill the trenches or holes in that room with cement?

"A. Because when I enter in the room [*sic*] my father was already working in the room and he said that there were some holes, trenches that had to be filled out."

Similarly, an officer of defendant and third-party plaintiff Novalex Contracting Corp., the project's general contractor, testified that plaintiff's employer, T-Construction, as concrete subcontractor, was responsible for "backfilling," or "closing," the trenches in the basement.

Plaintiff was walking backwards, "pulling" the concrete over the floor with his rake, when he inadvertently placed his right leg into a trench, with his left foot remaining on the floor above the trench. Plaintiff injured himself in attempting to step out of the trench, which he estimated to have been from three to four feet deep at the point where he stepped into it. When he stepped into the trench, it was about half full of concrete, which was flowing over the floor into it.

Contrary to the majority's claim, the record plainly establishes that filling the trench with concrete was an integral part of the work being performed at the time of the accident.[1] Hence, the premise on which the majority bases its reinstatement of plaintiff's claims—the notion that the trench could have been covered—is flatly wrong. Covering the trench obviously would have frustrated the goal of filling it. The record is not merely devoid of support for the majority's supposition that filling the trench was a task distinct and separate from the spreading of concrete over the floor; it plainly contradicts that supposition. In particular, there is not a shred of evidence to support the majority's assumption that a plan existed to pour concrete from wheelbarrows directly into the trenches after the rest of the floor had been laid. To the contrary, according to plaintiff's own testimony, the concrete was poured from the wheelbarrows onto the floor and then spread over the floor, in the course of which the trenches were filled in. And, to reiterate, plaintiff testified that the trench was already half full of concrete when he stepped into it.

The majority's speculation that "the trench could have been covered, and remained covered, until it was time for a wheelbarrow of concrete to arrive to pour concrete directly into it" is utterly disconnected from the reality portrayed in the record. Apparently, the majority imagines that the plan was for workers to pour concrete over the entire floor *except* for the trenches, wait for that concrete to dry, and then push additional wheelbarrows of wet concrete up to the trenches to fill them in. No hint of any such scheme can be found in the record. Indeed, plaintiff himself has never argued that the job should have been performed in this way.

Once the red herring of the alternative work method devised by the majority is dismissed, it can readily be seen that, on this record, plaintiff has no claim under either Labor Law § 240 (1) or § 241 (6). Since *covering* the trench (the only protective strategy the majority suggests) obviously would have been inconsis-

---

1. To reiterate, the evidence establishing that filling the trenches was part of plaintiff's job when he was injured includes testimony by plaintiff himself that he "had to fill . . . up" the trenches with concrete; his further testimony that, when he entered the room, his father told him that "there were some holes, trenches that had to be filled out"; and the testimony of the general contractor's principal that plaintiff's employer was responsible for "backfilling" or "closing" the trenches. In view of this evidence, which is entirely uncontroverted, I do not understand the majority's assertion that "the record does not contain any . . . facts" showing that filling the trench was part of plaintiff's job. The majority cannot simply wish away evidence inconvenient to its result.

tent with accomplishing the goal of *filling* the trench, it is illogical to construe either section 240 (1) or section 241 (6) to require such covering.[2] Plainly, neither statute was intended to make it unlawful to fill in trenches with concrete.

Moreover, even if I were to accept the majority's misperception of the evidence, the record establishes additional and independent grounds for dismissing plaintiff's claim under each statute. The Court of Appeals has long and consistently held that Labor Law § 240 (1) applies only where workers are exposed to "an elevation-related risk . . . call[ing] for any of the protective devices of the types listed" in the statute (*Rocovich v Consolidated Edison Co.*, 78 NY2d 509, 515 [1991]). The types of devices listed in the statute are "scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, [and] ropes" (*id.* at 513). Thus, even where an accident is related to an elevation differential, Labor Law § 240 (1) is not implicated if a device of the kind enumerated in the statute would not be used to address the risk posed by the particular difference in elevation that existed. For example, in the seminal *Rocovich* case, where the plaintiff fell into a 12-inch trough containing hot oil, the Court of Appeals held that section 240 (1) did not apply because "it is difficult to imagine how plaintiff's proximity to the 12-inch trough could have entailed an elevation-related risk which called for any of the protective devices of the types listed in section 240 (1)" (78 NY2d at 514-515).

More recently, in *Toefer v Long Is. R.R.* (4 NY3d 399 [2005]), the Court of Appeals held that, under the principle established by *Rocovich*, section 240 (1) did not cover a case in which the plaintiff fell between four and five feet from the trailer of a flatbed truck. The Court explained: "A four-to-five-foot descent from a flatbed trailer or similar surface does not present the sort of elevation-related risk that triggers Labor Law § 240 (1)'s coverage. Safety devices of the kind listed in the statute are normally associated with more dangerous activity than a worker's getting down from the back of a truck. Obviously, the distance between the work platform and the ground is relevant; no one would expect a worker to come down without a ladder or other safety device from a work platform that was 10 feet high. But the lesser distance [the plaintiff] had to travel, considering

---

**2.** Even if a claim under section 240 (1) cannot be defeated by showing that the use of safety device would have been "impracticable under the circumstances" (*Pichardo v Urban Renaissance Collaboration Ltd. Partnership*, 51 AD3d 472, 473 [2008]), in this case covering the trenches would have made it impossible—not merely impracticable—to carry out the task of filling the trenches.

the nature of the platform he was departing from, was not enough to make Labor Law § 240 (1) applicable" (4 NY3d at 408-409).[3]

*Toefer* cites, among other authority, the Court of Appeals' earlier decision in *Bond v York Hunter Constr.* (95 NY2d 883 [2000]), in which the plaintiff lost his footing as he alighted from a demolition vehicle and fell about three feet to the ground (*id.* at 884). In *Bond*, the Court of Appeals affirmed summary judgment dismissing the claim under Labor Law § 240 (1) on the ground that, "[a]s a matter of law, the risk of alighting from the construction vehicle was not an elevation-related risk which calls for any of the protective devices of the types listed in [the statute]" (*id.* at 884-885, citing *Rocovich*; *see also Broggy v Rockefeller Group, Inc.*, 8 NY3d 675, 681 [2007] ["liability turns on whether a . . . task creates an elevation-related risk of the kind that the safety devices listed in section 240 (1) protect against"]; *Dilluvio v City of New York*, 95 NY2d 928 [2000] [no claim under section 240 (1) where plaintiff fell three feet from the back of a pickup truck]).

The same principle established by the above-cited Court of Appeals decisions has been recognized by two different unanimous panels of this Court—each one including a different member of the present majority—within just the last two years (*see Romeo v Property Owner [USA] LLC*, 61 AD3d 491, 491 [2009] [where plaintiff's foot fell 18 inches through an opening created by a dislodged tile in a raised floor, section 240 (1) did not apply because the incident "did not involve an elevation-related hazard of the type contemplated by the statute, and did not necessitate the provision of the type of safety devices set forth in the statute"]; *Geonie v OD & P NY Ltd.*, 50 AD3d 444, 445 [2008] [the claim under section 240 (1) "was properly dismissed because plaintiff's stepping into the opening left by the removal of a tile in a raised 'computer floor' was not caused by defendants' failure to provide safety devices to protect against an elevation-related hazard"]).[4] If this principle was valid in *Romeo* and *Geonie*—and, to reiterate, two justices of the

---

**3.** The majority seeks to distinguish *Toefer* on the ground that the flatbed trailer from which the plaintiff fell was "inherently stable." This attempted distinction falls flat. There is nothing in the record to suggest that the floor of the basement room where plaintiff was injured (or, for that matter, even the trench he stepped into) was in any way unstable. Certainly, the basement floor in this case was more stable than a flatbed trailer sitting on wheels.

**4.** The other Departments of the Appellate Division have also recognized this principle (*see Wynne v B. Anthony Constr. Corp.*, 53 AD3d 654, 655 [2d Dept 2008] [dismissing claim where "plaintiff was not exposed to any risk that the safety devices referenced in Labor Law § 240 (1) would have protected

majority agreed that it was—I fail to see why the principle is not valid for this case. The majority simply asserts, without explanation, that, while the 18-inch drop in *Romeo* (and the presumably similar drop in *Geonie*) did not call for a protective device within the statute's contemplation, the three- to four-foot drop at issue here did. The majority does not suggest any protective device covered by the statute that would have been of use in this case but not in *Romeo* or *Geonie*; nor does the majority otherwise explain its seemingly arbitrary view.

Further, consistent with the line of Court of Appeals authority discussed above, all three of the other Departments of the Appellate Division have held, as a matter of law, that no claim under Labor Law § 240 (1) arises from a fall into a trench, ditch or hole of a depth comparable to, or even greater than, that of the trench at issue here (*see Miller v Weeden*, 7 AD3d 684, 685-686 [2d Dept 2004] ["plaintiff stepped into an uncovered hole that was approximately two feet wide by three feet deep"]; *Mancini v Pedra Constr.*, 293 AD2d 453, 454 [2d Dept 2002] [plaintiff fell "across and halfway down a trench that was five to six feet deep"]; *Magnuson v Syosset Community Hosp.*, 283 AD2d 404, 405 [2d Dept 2001] [plaintiff "fell into a three-foot deep hole"]; *Wells v British Am. Dev. Corp.*, 2 AD3d at 1142 [3d Dept 2003] [plaintiff, at an excavation, fell into an elevator pit that was "5 to 6 feet deep"]; *Paolangeli v Cornell Univ.*, 296 AD2d 691, 691 [3d Dept 2002] ["plaintiff fell into a hole in the concrete floor which he described as . . . five to seven feet deep"]; *Kaleta v New York State Elec. & Gas Corp.*, 41 AD3d 1257, 1257-1258 [4th Dept 2007] [plaintiff "fell into a three-foot-deep drainage ditch"]; *Pursel v Wellco, Inc.*, 6 AD3d 1096, 1097 [4th Dept 2004] [plaintiff "fell into an excavation approximately six feet deep"]; *Caradori v Med Inn Ctrs. of Am.*, 5 AD3d at 1064 [4th Dept 2004] [plaintiff "fell into a three-foot-deep trench"]; *Ozzimo v H.E.S., Inc.*, 249 AD2d 912, 913 [4th Dept 1998] [plaintiff fell into "an open five-foot trench" when "the earth beneath his feet gave way"]).[5]

In this case, not even the majority suggests that plaintiff's

against"]; *Wells v British Am. Dev. Corp.*, 2 AD3d 1141, 1143 [3d Dept 2003] [statute not implicated where plaintiff "did not require the use of one of the devices contemplated by Labor Law § 240 (1) in order to safely perform his tasks"]; *Caradori v Med Inn Ctrs. of Am.*, 5 AD3d 1063, 1064 [4th Dept 2004] [claim dismissed because plaintiff "was not exposed to the type of hazard that the use or placement of the safety devices enumerated in Labor Law § 240 (1) was designed to protect against" (citations and internal quotation marks omitted)]).

**5.** Consistent with the cases holding that Labor Law § 240 (1) does not cover a worker's fall into a hole of a depth similar to that at issue, it has been

work in proximity to a trench that was three to four feet deep called for the use of a protective device of any of the types enumerated in Labor Law § 240 (1). Certainly, the majority does not identify any protective device within the contemplation of the statute that should have been used to address the routine risk of a three- to four-foot drop in a basement floor (*cf. Runner*, 13 NY3d at 603 [liability under section 240 (1) attached where "a device precisely of the sort enumerated by the statute was not 'placed and operated as to give proper protection' to plaintiff"]). The majority nonetheless reinstates plaintiff's claim under section 240 (1) in reliance on *Carpio v Tishman Constr. Corp. of N.Y.* (240 AD2d 234 [1997]). In *Carpio*, a divided panel of this Court held that the statute applied to a case in which the plaintiff, while painting the ceiling of the third floor of a building, backed into an open piping hole (10 to 14 inches wide) in the concrete floor, "causing his leg to fall three feet below the surface to his groin area" (*id.* at 234). In my view, *Carpio* is inconsistent with the principle established by the above-cited Court of Appeals authority (including *Broggy*, *Toefer*, *Bond* and *Dilluvio*, all decided after *Carpio*) that section 240 (1) is implicated only where the work gave rise to "an elevation-related risk of the kind that the safety devices listed in section 240 (1) protect against" (*Broggy*, 8 NY3d at 681). That condition was not satisfied in *Carpio*, just as it is not satisfied here. Accordingly, I believe that we should follow the holding of the Court of Appeals—and of this Court's more recent decisions in *Romeo* (61 AD3d at 491) and *Geonie* (50 AD3d at 445)—rather than that of *Carpio*.[6]

The majority concedes that *Carpio*, and the result the majority reaches here in sole reliance on *Carpio*, are inconsistent with the holdings of the other three Appellate Division Departments. Further, the majority never comes to grips with the Court of Appeals' plainly stated holding that a necessary condition for the applicability of section 240 (1) is, to reiterate, "an elevation-related risk of the kind that the safety devices listed in section

held that the fall of an object onto a worker from such a height is not covered (*see Perron v Hendrickson/Scalamandre/Posillico [TV]*, 22 AD3d 731, 732 [2005], *lv denied* 7 NY3d 706 [2006] [statute not implicated where "the object that fell on the injured plaintiff's foot was, at most, two feet off the ground"]).

**6.** I note that, since the task in *Carpio* (painting the ceiling) did not require leaving the hole in the floor uncovered, *Carpio* does not stand for the implausible proposition that liability under section 240 (1) can be predicated on a failure to cover a hole at the same time as it is being filled. I further observe that this Court found it significant in deciding *Carpio* that the plaintiff therein stepped into the uncovered hole when his "attention was focused toward the ceiling [that he was painting]" (240 AD3d at 235).

240 (1) protect against" (*Broggy*, 8 NY3d at 681). Instead, the majority gives the Court of Appeals decisions articulating that requirement (*see id.*; *Toefer*; *Dilluvio*; *Bond*; *Rocovich*) an unnaturally restrictive reading, in effect limiting such precedents to their facts while studiously ignoring the principle governing the reach of the statute there articulated. Nothing in these Court of Appeals decisions supports the majority's assumption that the Court of Appeals "intended to tether the application of its holding to the particular circumstances of th[ose] case[s]" (*People v Abney*, 57 AD3d 35, 50 [2008, Moskowitz, J., dissenting], *revd* 13 NY3d 251 [2009]). In sum, this case simply is not one in which plaintiff was injured because of any failure to provide him with "a device precisely of the sort enumerated by the statute" (*Runner*, 13 NY3d at 603). Rather, plaintiff's injury resulted from a "routine workplace risk[ ]" not covered by the statute (*id.*; *see also Cohen v Memorial Sloan-Kettering Cancer Ctr.*, 11 NY3d 823, 825 [2008] [Labor Law § 240 (1) protections do not extend to "the usual and ordinary dangers at a construction site" (citation and internal quotations marks omitted)]; *Meslin v New York Post*, 30 AD3d 309, 310 [2006] [dismissing Labor Law § 240 (1) claim where "the accident was not attributable to the kind of extraordinary elevation-related risk contemplated by the statute"]).

Plaintiff's claim under Labor Law § 241 (6) is equally meritless. The only provision of the Industrial Code plaintiff invokes in support of his claim under section 241 (6) is 12 NYCRR 23-1.7 (b) (1). This Court has held that the requirements of the portion of section 23-1.7 (b) (1) that specifically addresses situations in which "employees are required to work close to the edge of . . . [a hazardous] opening [into which a person may step or fall]" (12 NYCRR 23-1.7 [b] [1] [iii]) do not apply where the drop to which the workers were exposed was less than 15 feet (*see Hernandez v Columbus Ctr., LLC*, 50 AD3d 597, 598 [2008]; *Dzieran v 1800 Boston Rd., LLC*, 25 AD3d 336, 338 [2006]; *see also Romeo*, 61 AD3d at 492 [12 NYCRR 23-1.7 (b) (1) did not apply where the opening "did not present significant depth and size to warrant the protection of the provision"]; *Geonie*, 50 AD3d at 445 [12 NYCRR 23-1.7 (b) (1) did not apply "because the opening into which plaintiff stepped was not the type of opening intended to be covered by the regulation"]). Thus, even if the trench in this case constituted a "hazardous opening" within the meaning of 12 NYCRR 23-1.7 (b) (1), no violation of that Industrial Code provision occurred.

The majority's theory that the claim under section 241 (6) may be predicated on subparagraph (i) of 12 NYCRR 23-1.7 (b)

(1) is without merit.[7] When 12 NYCRR 23-1.7 (b) (1) is read as a whole, it is clear that subparagraph (i), a general provision providing for the guarding with fastened covers or safety railings of "hazardous opening[s] into which a person may step or fall," does not apply in this case, where covering the opening in question would have been inconsistent with filling it, an integral part of the job.[8] Subparagraph (iii) addresses cases of the specific kind presented here, in which "employees are required to work close to the edge of such an opening." In denying the relevance of subparagraph (iii), the majority ignores the undisputed facts of this case, which, as previously discussed, establish that plaintiff was injured while engaged in filling the trench, a task that could not be performed while the trench was covered.[9] Contrary to the majority's assertion, my reading of subparagraph (iii) does not "negate[ ] the balance of the rule," but merely applies subparagraph (iii) in accordance with its terms, namely, to situations where a task requires leaving an opening uncovered. Subparagraph (i) remains applicable where

---

**7.** 12 NYCRR 23-1.7 (b) (1) provides in pertinent part as follows:

"(b) Falling hazards.

"(1) Hazardous openings.

"(i) Every hazardous opening into which a person may step or fall shall be guarded by a substantial cover fastened in place or by a safety railing constructed and installed in compliance with this Part (rule). . . .

"(iii) Where employees are required to work close to the edge of such an opening, such employees shall be protected as follows:

"(a) Two-inch planking, full size, or material of equivalent strength installed not more than one floor or 15 feet, whichever is less, beneath the opening; or

"(b) An approved life net installed not more than five feet beneath the opening; or

"(c) An approved safety belt with attached lifeline which is properly secured to a substantial fixed anchorage."

**8.** Thus, *Gallagher v Levien & Co.* (72 AD3d 407 [2010] [decided simultaneously herewith]), in which a Labor Law § 241 (6) claim based on 12 NYCRR 23-1.7 (b) (1) (i) is sustained, is distinguishable on the ground that, in that case, the work did not require leaving the hole at issue uncovered.

**9.** The fact that filling the trenches was part of the job is not changed one whit by the circumstance that, at the moment he stepped into the trench, plaintiff was spreading concrete over the floor and was unaware that the trench was directly behind him. Contrary to the majority's implication, the record shows that plaintiff was always aware that there were trenches in the room. As previously discussed, and as shown by plaintiff's own testimony, directing the concrete over the floor and into the trenches was one continuous job. The majority's attempt to draw a bright line between covering the floor and filling the trenches is, on this record, completely artificial and unrealistic.

covering a hazardous opening is consistent with the work to be performed. By contrast, the majority implies that it is never lawful to assign a task requiring that work be performed next to an uncovered opening. What the majority fails to explain is how one can fill a hole that has a cover fastened over it.

As to the majority's suggestion that it is for the finder of fact to determine "whether [the job] could reasonably have been done in a different way that would have better ensured the safety of the workers," it bears repetition that plaintiff himself has never suggested, through expert evidence or otherwise, that the job should have been done in some way other than the manner in which it was actually performed. The alternative method suggested by the majority—waiting to fill in the trench until after the rest of the floor had been completed—is, to reiterate, the majority's own invention; not even a hint of it appears in the record. The majority has no idea whether its preferred alternative would have been reasonable, or even feasible. In particular, the majority cannot enlighten us as to whether the manner of proceeding that it suggests would have affected the quality of the floor surface ultimately produced. Nor can the majority tell us whether it would have been feasible to fill in the trench completely by dumping wheelbarrows of wet cement into it, rather than by directing into it a continuous flow of wet cement across the floor.[10]

Finally, to the extent the alternative method proposed by the majority might theoretically have been feasible, failing to use that method would not have constituted a violation of section 240 (1). If the work were conducted as envisioned by the majority, the workers still would have been required, at the end of the process, to stand next to an uncovered trench being filled with cement, just as plaintiff was doing when he was injured. Thus, assuming for the sake of argument that (as the majority contends) it would have been somewhat safer to fill the trench after completing the rest of the floor, the fault the majority purports to have identified is, at most, an arguable error in the sequencing or organizing of the work (i.e., directing the workers to fill the trench at the same time they were spreading cement over the rest of the floor). Such a failure would not have constituted a violation of the statutory mandate to "furnish or erect

---

**10.** The majority concludes by asserting that it was defendants' burden, as proponents of the summary judgment motion, somehow to prove that no alternative work method exists that, if used, might have avoided the accident, even though plaintiff has not suggested even one such alternative work method. To place this burden on defendants is to require them to prove a negative, which is impossible.

. . . devices" (Labor Law § 240 [1]) to protect the workers from elevation-related risks.[11] In other words, the language of section 240 (1) simply does not reach arguably suboptimal choices in the sequencing or organizing of work. In applying the statute to such conduct, the majority stretches its language beyond recognition.[12]

For the reasons discussed above, I would affirm the grant of summary judgment dismissing plaintiff's claims under Labor Law § 240 (1) and § 241 (6), and respectfully dissent from the majority's reinstatement of those claims.

(April 6, 2010)

11. In pertinent part, Labor Law § 240 (1) provides: "All contractors and owners and their agents . . . in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed."

12. Nor would any error in sequencing or organizing the work constitute a violation of 12 NYCRR 23-1.7 (b) (1) (i), the Industrial Code provision on which the majority predicates its reinstatement of plaintiff's Labor Law § 241 (6) claim. The language of that provision, which is set forth in footnote 7 above, plainly does not reach an error in sequencing or organizing work.